**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 07 CR 843** |
| v. | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **RONDELL FREEMAN,** | ) | |
| **BRIAN WILBOURN,** | ) | |
| **DANIEL HILL, and** | ) | |
| **ADAM SANDERS** | ) | |

## OPINION AND ORDER

This order addresses the following post-trial motions brought by defendants Rondell

Freeman, Brian Wilbourn, Daniel Hill, and Adam Sanders: (1) Freeman's motion for new trial

or in the alternative for a judgment of acquittal, (2) Wilbourn's motion for new trial,

(3) Wilbourn's motion for judgment of acquittal, (4) Wilbourn's motion to reconsider denial of

his motion to dismiss counts tainted by trial perjury, (5) Hill's motion for judgment of acquittal,

(6) Hill's motion for new trial, (7) Sanders's motion for judgment of acquittal after return of

verdict, (8) Sanders's motion for judgment of acquittal as to the cocaine conspiracy charged in

Count One, and (9) Sanders's motion for new trial. Freeman, Hill, and Sanders have joined and

adopted Wilbourn's motions to the extent they concern false testimony by Senecca Williams and

have incorporated many of Wilbourn's arguments on that issue into their own post-trial motions.

For the reasons discussed below, Wilbourn's motion for new trial and his motion to

reconsider denial of his motion to dismiss counts tainted by trial perjury will be granted in part

and denied in part. Defendants' post-trial motions will otherwise be denied.

## BACKGROUND

On March 26, 2009, following a five-week jury trial, defendant Rondell Freeman was convicted on the following counts of the indictment in this case:  Count One (conspiring to distribute and possess with intent to distribute 50 grams or more of crack cocaine, 5 kilograms or more of cocaine, between 100 and 999 grams of heroin, and a measurable amount of marijuana in violation of 21 U.S.C. § 846); Count Three (possession with intent to distribute mixtures and substances containing heroin in violation of 21 U.S.C. § 841(a)(1)); Counts Four and Five (using a telephone to facilitate a narcotics distribution conspiracy in violation of 21 U.S.C. § 843(b)); Count Six (being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)); Count Eight (possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(e)); Count Eleven (possession with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1)); and Counts Sixteen, Seventeen, and Eighteen (using a telephone to facilitate a narcotics distribution conspiracy in violation of 21 U.S.C. § 843(b)).

Defendant Wilbourn was convicted on Count One (conspiring to distribute and possess with intent to distribute 50 grams or more of crack cocaine, 5 kilograms or more of cocaine, between 100 and 999 grams of heroin, and a measurable amount of marijuana in violation of 21 U.S.C. § 846); Count Three (possession with intent to distribute mixtures and substances containing heroin in violation of 21 U.S.C. § 841(a)(1)); Count Four (using a telephone to facilitate a narcotics distribution conspiracy in violation of 21 U.S.C. § 843(b)); Count Seven (being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)); Counts Ten and Eleven (possession with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1)); and Counts Twelve and Thirteen (possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1)).

Defendant Hill was convicted on Count One (conspiring to distribute and possess with intent to distribute 50 grams or more of crack cocaine, 5 kilograms or more of cocaine, between 100 and 999 grams of heroin, and a measurable amount of marijuana in violation of 21 U.S.C. § 846) and Count Thirty-Five (possession with intent to distribute 5 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1)).

Defendant Sanders was convicted on Count One (conspiring to distribute and possess with intent to distribute 50 grams or more of crack cocaine, 5 kilograms or more of cocaine, between 100 and 999 grams of heroin, and a measurable amount of marijuana in violation of 21 U.S.C. § 846); Counts Twenty, Twenty-One, and Thirty (using a telephone to facilitate a narcotics distribution conspiracy in violation of 21 U.S.C. § 843(b)); and Count Thirty-Two (possession with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1)).

## LEGAL STANDARDS

Defendants bring their motions for new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A district court "should reverse a jury verdict only if, viewing the evidence in the light most favorable to the prosecution, the record contains no evidence on which a rational jury could have returned a guilty verdict." *United States* v. *Murphy*, 406 F.3d 857, 861 (7th Cir. 2005).

## DISCUSSION

In support of their motions for new trial and judgment of acquittal, defendants assert a multitude of grounds and challenge a substantial number of the court's previous rulings, the bulk of which were made after the parties had presented their arguments with respect to each. For many of those issues, defendants have offered no new arguments or authorities in support of their present motions, and even where they have, the court is, for the most part, not persuaded that any of its earlier rulings were incorrect or otherwise merit further discussion here.

The court will address at length, however, defendant Wilbourn's argument that the government committed prosecutorial misconduct with respect to false testimony by cooperating witness Senecca Williams. Many of Wilbourn's arguments on this issue were previously presented in his motion to dismiss counts tainted by trial perjury, in which he sought dismissal of Counts One, Ten, Eleven, and Thirteen. That motion, which Wilbourn brought prior to the close of evidence, was denied because even if his arguments were correct on the merits (which the court did not address at that time), Wilbourn had not demonstrated that dismissal of the charges rather than a new trial would be the appropriate remedy. Wilbourn subsequently brought a motion to reconsider denial of the motion to dismiss, which the court took under advisement along with Wilbourn's motion for new trial. In addition to incorporating the arguments set forth in his motion to dismiss, Wilbourn's motion for new trial also asserts new arguments based on events that occurred after he filed the earlier motion. Additionally, defendants Freeman, Hill, and Sanders have joined and adopted Wilbourn's motions concerning false testimony by Senecca Williams and have incorporated many of the same arguments into their own post-trial motions.

Wilbourn's motions are largely concerned with Senecca Williams's testimony on direct examination that he personally observed Wilbourn during late 2002 and early 2003 at a

particular location—co-defendant Rondell Freeman's sixth-floor apartment on Granville

Avenue, often referred to as the "Penthouse" or the "Granville apartment"—packaging drugs and

discussing drug-related business with Freeman. The government has since conceded that

Wilbourn was continually incarcerated from April 23, 2002 until September 8, 2005. It is also

undisputed that Freeman occupied the Granville apartment only during 2003 and 2004, at which

time he moved to the Sheridan Road apartment.[1] Thus, as Wilbourn argues, it is not possible that

he either (a) ever "set foot" in the Penthouse apartment during the time it was occupied by

Freeman or (b) packaged drugs at any other location during late 2002 and early 2003.

Before addressing the legal grounds asserted in Wilbourn's motion, a brief chronology of

the trial proceedings on this issue is helpful. On March 2, 2009, the government called Senecca

Williams, a cooperating witness who had previously agreed to plead guilty to the conspiracy

charge pursuant to a written plea agreement. Williams was one of the government's key

witnesses on the conspiracy charges against defendants Freeman, Wilbourn, Hill, and Sanders.

---

[1] Although the government does not expressly admit this fact in its responses to
Wilbourn's motions, neither has it argued or presented evidence to the contrary. Moreover, all
of the evidence of which the court is aware regarding this issue, including uncontroverted
testimony elicited by the government on direct examination, supports this conclusion.
  Additionally, the court notes the following assertions made by the government in its
*Santiago* proffer:

> Around early 2003, Rondell Freeman began to use apartments located on Granville
> Avenue in Chicago, initially an apartment on the 3rd floor, and then an apartment on the
> top floor in the same building that was referred to as the "Penthouse" by Rondell and
> others. . . .
>
> * * *
>
> Sometime during 2004 a building employee left a note in the Penthouse next to
> some drugs. After that, Freeman moved his drug packaging house to the Sheridan Shores
> condo.

Gov.'s *Santiago* Proffer at 39–40.

Williams's role in the alleged conspiracy was as a mixer and bagger, primarily for Rondell Freeman, of various narcotics, including powder cocaine, crack cocaine, and marijuana, though he also testified that he had experience selling crack cocaine and marijuana.  During his direct examination, which spans more than 200 pages of trial transcript, Williams covered nearly a decade, testifying about events from as early as 1998 and as late as 2007.  Among other topics, Williams (a) identified individuals involved in Freeman's drug operations; (b) detailed how drugs were prepared, packaged, distributed, and sold; (c) identified in government photographs various items used for preparing and packaging narcotics; (d) listed the nicknames and code words used within Freeman's drug operation to identify various drug types, quantities, and packaging; (e) interpreted conversations and sounds recorded by the government pursuant to court-authorized surveillance; and (f) described the economics of Freeman's operations, including detailed testimony as to how much various quantities of different types of narcotics were worth, how money obtained from drug sales would typically be split between supplier and seller, and how much Williams was paid for bagging a given amount of a particular narcotic.

Of particular significance as to Count One, Williams's testimony expressly placed each of the defendants within the charged conspiracy.  He testified not only to seeing Freeman, Wilbourn, Hill, and Sanders prepare, transport, and sell drugs at particular locations during different time periods, but also to his recollection of specific incriminating conversations, understandings, and joint activities among them.  Williams testified, for example, that Wilbourn used the same code words as Freeman to refer to heroin and crack cocaine, that he saw Wilbourn

help Freeman prepare and package heroin, and that Wilbourn sold Freeman's drugs.[2]  Of

particular importance here, Williams testified on direct as to Wilbourn's activities at the

Granville Apartment, including the following recollections:

> Q. You mentioned that you saw Brian Wilbourn at this apartment as well.
>
> A. Yeah.
>
> Q. What would you see Brian Wilbourn do at this apartment?
>
> A. I seen him bag up crack cocaine,[] heroin, and marijuana.
>
> Q. What kind of packaging would Mr. Wilbourn use to package his drugs?
>
> A. I seen him packaged in orange striped bags.
>
> Q. Mr. Williams, do you recall the first time that you saw Mr. Wilbourn using orange stripe bags?
>
> A. Yes.
>
> Q. And when was that?
>
> A. That was earlier 2003.
>
> Q. When you saw—did you hear any conversations between Mr. Williams and others explaining his movement to the orange stripe bag?
>
> A. It was just one day Rondell Freeman was having Brian Wilbourn came in.  They had a big bag of seals, all—different kinds, blue devil, blue stripe, and orange stripe.  Then they was talking about how this person who picked color—what their color was.  Brian Wilbourn had the orange stripe.  Royce Hatter had the blue stripe.  And Rondell Freeman stuck with the blue dev.
>
> Rondell then stated that he was going to stop around with the orange stripes, that he would surprise people with the new crack bag and saying that he was going to make new clientele, sell—I guess sell a lot.  And Royce Hatter was saying he was going to do the same thing with the blue stripes.  Rondell Freeman was saying that can't nothing mess with the blue devil label.
>
> Q. And when Mr. Wilbourn—did you see him package drugs in orange stripe bags?
>
> A. Yes.

---

[2]  Such testimony was of particular significance given Wilbourn's defense to the conspiracy charge.  Wilbourn did not contest either that he was a drug dealer or that he had close personal ties and non-narcotics-related business relationships with Freeman, but argued that when he had bought or sold drugs he had done so as an independent operator:  "Brian Wilbourn was not a member of Rondell Freeman's—any drug trafficking organization.  He was not Rondell's partner.  He was not his employee."  Tr. at 2741:11–14.

Q. Who did he get the crack from that he put in the orange striped bags?

A. He got it from Rondell Freeman.

Tr. at 1349:3–1350:13. Williams also testified about his specific recollections of another

conversation between Rondell Freeman and Wilbourn at the Granville apartment:

Q. Did there ever come a time when you heard -- did you ever hear Rondell Freeman say anything about Adam Sanders and being owed money?

A. Yes.

Q. When was that?

A. Around 2002, 2003.

Q. Where were you?

MS. AMDUR [Sanders's counsel]: Objection, your Honor. We need better foundation than around 2002 and 2003.

THE COURT: Try to get some more information.

BY THE WITNESS: A. Late 2002 to early 2003.

BY [Assistant United States Attorney] MS. TRIVEDI:

Q. Where were you?

A. I was at the Granville address.

Q. Who else was there?

A. Rondell Freeman, Brian Wilbourn.

Q. What were you doing?

A. I was packaging for Rondell Freeman.

Q. What were you packaging?

A. Crack cocaine.

Q. What was Mr. Freeman doing?

A. He was mixing some crack—mixing powder cocaine to crack cocaine, and having a conversation with Brian Wilbourn at the same time.

Q. What was Mr. Wilbourn doing?

A. He was sitting—sitting down.

Q. Okay. And what did Mr. Freeman say to Mr. Wilbourn?

A. He was talking about how Redman[3] owed him some money. That Brian Wilbourn stated and said, don't worry about him, I'm going to take care of him. He going—he going to pay your money back.

Q. Did the two of them say anything else?

A. Just in general that, you know, that he—Redman owed him some money. Brian Wilbourn would say that he was going to hit him with some—some crack to sell so he could sell that and pay the money—and the money he get paid off that he can pay Rondell Freeman the money he owed.

Q. Okay. So let's—there was a lot of hes in that sentence so let's break it down to get a little bit simpler. Go ahead.

A. I'm just talking he as in Brian—Rondell Freeman, Brian Wilbourn, and Adam Sanders, all in general.

Q. Okay. And so what did Brian Wilbourn say that he, meaning Brian Wilbourn, would do?

A. Saying he was going to go give Redman some crack cocaine to sell to pay Rondell Freeman back.

Q. Okay. After that conversation in late 2002 or 2003, did you see Adam Sanders with orange striped bags?

A. Yes.

Q. Did you ever hear Rondell Freeman say that he had paid Adam Sanders's bond money?

A. Yeah.

Tr. at 1466:6–1468:8.

Williams's cross examination began on March 4, 2009. When Wilbourn's counsel confronted Williams with the fact that Wilbourn was incarcerated from April 2002 to September 2005, one of the Assistant United States Attorneys on the government's trial team objected, stating in open court and in the presence of the jury, "Objection. That's not true." Tr. at 1548:18. The court overruled the objection and allowed Wilbourn's counsel to repeat the query, to which Williams answered, "I don't know if it to be true. [*sic*]" Tr. at 1548:23–25.

---

[3] "Redman" is a nickname for Adam Sanders.

Despite a number of additional attempts by various defense counsel to impeach Williams based on the dates of Wilbourn's incarceration, Williams never conceded either that he was lying or that he must be mistaken. Nor did the government ever correct the record while Williams was on the stand. Quite to the contrary, the government attempted to rehabilitate him on redirect by eliciting testimony that, after enduring several days on the witness stand, Williams had "talked about a long period of time in [his] life" and "ha[d not] been able to give precise dates for when everything happened," but had "been truthful" and "had [no] doubt in [his] mind about the type of things [he] testified to." Tr. at 1654:1–17.

On March 11, 2009, outside the presence of the jury, Wilbourn's counsel informed the court of his intent to file a motion to dismiss the counts against Wilbourn as to which Senecca Williams had offered false testimony. At that time, defense counsel stressed that because Wilbourn was continuously incarcerated from April 2002 to September 2005 and the Granville apartment was occupied by Freeman only from late 2002 or early 2003 until the end of 2004, Williams's testimony about the events and conversations purportedly involving Wilbourn at the Granville Apartment was necessarily false. Wilbourn's counsel also stressed that the government had an obligation under *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), to correct the record.

Assistant United States Attorney Rachel Cannon stated that the government would agree to a stipulation as to the dates of Wilbourn's incarceration, Tr. at 2308, but argued, "Mr. Williams talked about a nine—in fact, a ten-year period. If Mr. Goodman [Wilbourn's counsel] wants to argue to the jury he's perjuring himself, he's absolutely free to do that. Mr. Williams made clear he could not be accurate about the dates. Our argument will be he was wrong about

the dates but the facts remain true." Tr. at 2312. The court then informed Cannon, "[Y]ou know, you as the representative of the United States have an obligation to make sure that the evidence you're presenting is, as far as you know, truthful and accurate . . . ," to which Cannon replied, "And we stand by everything that's been presented, your Honor." Tr. at 2312.

On March 13, 2009, Wilbourn filed his "Motion to Dismiss Counts Tainted by Trial Perjury," requesting dismissal of Counts One, Ten, Eleven, and Thirteen.

On March 16, 2009, just before the government rested in its case in chief, a stipulation was read to jury as to the dates of Wilbourn's incarceration.

Closing arguments began on March 17, 2009. In its summation, the government expressly relied on Senecca Williams's testimony as to a number of factual issues, including connecting Wilbourn to the conspiracy through his use of orange-striped bags. In their closing arguments, defense counsel for a number of the defendants, including Wilbourn, argued that Williams had perjured himself on the stand, citing various inconsistencies and impossibilities, including Williams's testimony about Wilbourn's activities at the Granville Apartment.

In its rebuttal argument, the government argued that Williams had not fabricated evidence but merely been imprecise or mildly mistaken about the dates on which some events occurred. Although the court twice sustained defense objections on the issue, Cannon argued that Williams's testimony about Brian Wilbourn's activities around 2002 and 2003 were factually accurate except that they had occurred earlier:

> [MS. CANNON:] Now, you saw the gotcha game that was played with them. What happened when the insider witnesses got dates wrong? And let's talk about that. First of all, who could talk about a 10-year period of time and have exact precise dates for when things occurred? That's just not human and that is just not natural.

MR. GOODMAN: Objection, Your Honor. I think this is misleading with respect to a witness. There's not mistaken of dates. They're putting people in places that they physically could never have been.

MS. CANNON: Your Honor, this is argument.

THE COURT: Be—well, be accurate then.

MS. CANNON: Yes.

THE COURT: Go ahead.

MS. CANNON: Ladies and gentlemen, they talked about events that happened on certain dates as best they could remember them. Now, who could go back in time for 10 years and remember exactly what dates things happened? Think about it. There's lots of ways to think about this. If someone asked a teacher who were your students over the past 10 years, they could probably tell you who many of their students were. They could tell you many general dates that they had them. But if a student said—if a teacher said I had Suzy Smith in 2002 and it was really 2001, does that mean the teacher's lying? No.

If you ask a business person who have been your clients over the past 10 years and they told you who their clients were and they told you the general cases that they worked with them on, but if they put them in 2004 when it really should have been 2005, does that mean they're lying? No. That's what's going on here. And, ladies and gentlemen, isn't that exactly how you know that these witnesses aren't coached by us, that they're not our puppets? Isn't that exactly how you know that they are testifying to the best of their memory as best they can recall it the incidents as they happened.

*So Senneca Williams said things happened with Brian Wilbourn around 2002 and 2003, and it was really 2001—*

MR. GOODMAN: Objection, Your Honor. He puts him at a penthouse apartment that Brian Wilbourn has never been to.

THE COURT: Correct.

MS. CANNON: Your Honor, this is argument.

MR. GOODMAN: This is misleading.

THE COURT: I think that is inaccurate.

MS. CANNON: Ladies and gentlemen, it's for you to decide whether these witnesses were testifying to facts as they remember them or whether they were actually lying. And we would submit to you that *they did the best they could with the dates, but they knew where they were and what happened.*

Tr. at 2892:19–2894:16 (emphasis added).

Wilbourn relies on *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217

(1959), and related precedents for the principle that the government "may not knowingly use

false evidence, including false testimony, to obtain a tainted conviction." *Id.* In *Napue*, the Supreme Court reversed the lower court's denial of post-conviction relief to the petitioner, finding that the prosecution had knowingly allowed one of its key witnesses to falsely testify that he had received no promise of consideration in return for his testimony and that this false testimony may have had an effect on the outcome of the trial. *Id.* at 271–72. *Napue* thus made clear that the government's use of false testimony to obtain a conviction is a violation of due process. *McGeshick* v. *Fiedler*, 3 F.3d 1083, 1087 (7th Cir. 1993) (citing *Napue*, 360 U.S. 264).

Following *Napue*, the Seventh Circuit has established that to receive a new trial on the basis of the government's use of allegedly perjured testimony, a defendant must show that "(1) the prosecution's case included perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) there is a likelihood that the false testimony affected the judgment of the jury." *Simental* v. *Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004). Mere inconsistencies in government witnesses' testimony, however, do not establish the government's knowing use of false testimony. *United States* v. *Saadeh*, 61 F.3d 510, 523 (7th Cir.1995) (citing *United States* v. *Verser*, 916 F.2d 1268, 1271 (7th Cir.1990)). Rather, "the alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *United States* v. *Adcox*, 19 F.3d 290, 295 (7th Cir.1994). Finally, when a defendant alleges that the prosecution used perjured testimony, the court must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination. *Saadeh*, 61 F.3d at 523.

The government argues that Wilbourn has failed to demonstrate the government knowingly or intentionally used perjured testimony. First, the government argues that defendant has failed to establish that Williams's testimony was perjured, as opposed to merely mistaken.

In support of this argument, the government cites the fact that Williams "repeatedly made clear during his testimony that he could not be specific about the dates on which certain events occurred." Gov.'s Resp. to Wilbourn's Mot. to Dismiss at 3. Additionally, the government attempted to rehabilitate Williams on redirect by eliciting testimony that, after enduring a number of days on the witness stand, he had "covered near[ly] a decade," and had not "been able to give precise dates for when everything happened," though he had "been truthful" and "had [no] doubt in [his] mind about the type of things [he] testified to." Tr. at 1654:4–17.

The court cannot accept, however, the government's glib assertion that "it is abundantly clear from the record that Williams was *at most merely mistaken about the dates* of the occurrences about which he testified." *Id.* (emphasis added). For Williams's testimony was false not only because the drug-related activities involving Wilbourn that Williams recounted as occurring in late 2002 and early 2003 could not have taken place during that time period, but also because those events could not have occurred where Williams claims they took place—the Granville apartment, in which Wilbourn was never present.

Furthermore, whether or not Williams was committing perjury—that is, intentionally lying as opposed to merely being mistaken in his testimony—is beside the point. It is well established that the prosecution may not use testimony that it knows to be false. *Giglio* v. *United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue*, 405 U.S. at 269. As the Seventh Circuit has explained, "[t]he wrong of knowing use by prosecutors of perjured testimony is . . . misnamed—it is knowing use of false testimony." *United States* v. *Boyd*, 55 F.3d 239, 243 (7th Cir. 1995) (internal citations omitted). Thus, "[i]t is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew,

14

false," regardless of whether the witness could have been successfully prosecuted for perjury. *Id.*

Second, the government argues that Wilbourn has not shown that, at the time Williams was on the stand, the government either knew Williams's testimony was false or exhibited a reckless disregard for the truth. Wilbourn argues that as early as the time of Williams's testimony before the grand jury—that is, well before trial—the government possessed Wilbourn's criminal history and a certified statement of his prior state court conviction. According to Wilbourn, these documents "clearly show[] that Wilbourn was incarcerated from April 23, 2002 until his release on parole." Wilbourn's Mot. to Dismiss at 12.[4]

The government, on the other hand, argues that the certified statement of conviction is contradictory as to the dates of Wilbourn's incarceration. For example, as the government points out, that document states in three separate entries, "4/23/02 DEFENDANT NOT IN COURT," "4/23/02 DEF REM CUST CC SHERIF," and "4/23/02 NO BAIL." Dkt. No. 592-2, at 1. The government contends that it is unclear from these entries whether Wilbourn "was not in court on April 23, 2002, and a no-bail warrant was therefore issued for him, or whether he arrived in court late and was then taken into custody." Gov.'s Resp. to Wilbourn's Mot. to Dismiss at 6. Nevertheless, any uncertainty about whether Wilbourn was in custody as of April 23, 2002 is of limited relevance here, given that a later entry clearly states that he was in custody as of April

---

[4] Wilbourn further argues that in addition to having these documents, the government had received notice prior to trial from Wilbourn's counsel that Williams's grand jury statement contains a mistake in that Wilbourn was incarcerated at the time that Williams places him at the Granville apartment. The government does not dispute that Wilbourn's counsel told the government as much in a written communication dated December 26, 2008, more than two months before commencement of the trial, but inexplicably suggests that it was unable to verify counsel's claims.

30, 2002, only a week later.  Dkt. No. 592-2, at 1.  The government also cites an entry on the fourth page of the certified statement of conviction stating, "2/20/03  BAIL REVOKED."  *Id.* at 4.  The government contends that this entry implies that Wilbourn "had not been in custody, but free on bail, or house arrest, and then taken back into custody on February 20, 2003."  Gov.'s Resp. to Wilbourn's Mot. to Dismiss at 6.

The court need not decide whether the certified statement of conviction is, as Wilbourn argues, a clear and definitive record of his custodial status.  For the government, on the same day it filed its response to Wilbourn's motion to dismiss, stipulated to the dates of Wilbourn's incarceration.  And well after entering that stipulation, the government—specifically, prosecutor Rachel Cannon in the government's rebuttal argument—continued to use Williams's testimony about Wilbourn's activities at the Granville apartment in late 2002 and early 2003.

Third, the government argues that Wilbourn had ample opportunity to cross-examine Senecca Williams on this issue.  When Wilbourn's counsel attempted to confront Williams with the dates of Wilbourn's incarceration, however, the government objected, stating, "Objection. That's not true."  Tr. at 1548:18.  Vouching for a witness is, of course, strictly forbidden:  "a prosecutor may not express her personal belief in the truthfulness of a witness," *United States* v. *Morris*, 498 F.3d 634, 252 (7th Cir. 2007) (internal quotation marks omitted), let alone answer a question posed by defense counsel to the government's witness on cross examination.  Although the government subsequently entered into a stipulation as to the dates of Wilbourn's incarceration, that stipulation likely garnered far less attention than the government's earlier statements vouching to the contrary, which forcibly muted what might otherwise have been devastating impeachment.  Indeed, the stipulation was read to the jury a full 12 days after

Williams's cross examination; it included a lengthy preamble listing the names of the respective attorneys who were party to it;[5] and it was read along with a number of other similarly technical stipulations, in between the testimony of two government witnesses.

Defendants, moreover, certainly had no chance to respond to the government's rebuttal, during which Cannon argued to the jury that the government's witnesses "did the best they could with the dates, but they knew where they were and what happened."  Tr. at 2894:15–2894:16. The government now argues that such arguments were proper:

> Each of the defendants argued to the jury that because the insider witnesses could not recall precise dates, or described events as occurring during dates in which their clients may have been incarcerated, the events about which they testified must never have occurred.  The government responded that these witnesses were not fabricating the events they described, but instead, were giving estimates as to the dates [] on which the events occurred, some of which may have been incorrect.  It was both correct and appropriate to make this point.

Gov.'s Consol. Resp. to Defs.' Post-Trial Mots. at 48–49.

While such arguments may have been permissible on a general level, *see, e.g.*, *United States* v. *Leibowitz*, 857 F.2d 373, 379 (7th Cir. 1988) ("Witnesses who testify inconsistently about approximate dates cannot be said to commit perjury."), Cannon's comments during the government's rebuttal were not limited to downplaying the chronological imprecision of the testimony of the government's insider witnesses generally, or even of Senecca Williams's

---

[5]  In full, the stipulation read as follows:  "Defendant Brian Wilbourn through his attorney Leonard Goodman and the United States of America through Assistant United States Attorneys Rachel Cannon, Kruti Trivedi, and Sharon Fairley hereby agree and stipulate that Brian Wilbourn was continually incarcerated either in the Cook County Jail or in the Illinois Department of Corrections from April 23rd, 2002, through September 8th, 2005."  Tr. at 2509:22–2510:3.

testimony as a whole.[6]  Rather, Cannon attempted to bolster the very testimony on which

Wilbourn had based his motion to dismiss counts tainted by perjury, arguing, "So Senneca

Williams said things happened with Brian Wilbourn around 2002 and 2003, and it was really

2001—" Tr. at 2894:4–5.  She specifically asked the jury to rely on William's false testimony

about Wilbourn's activities at the Granville apartment, which he had never visited.  *See United*

*States* v. *Thomas*, 987 F.2d 1298, 1300 (7th Cir. 1993) ("Countless cases have held that a

prosecutor's knowing use of perjury or failure to correct false testimony may violate a

defendant's right to a fair trial if the false testimony could have affected the jury's judgment.");

*see also Ruiz* v. *Cady*, 635 F.2d 584, 588 n.5 (7th Cir. 1980) (noting that in *Giglio* v. *United*

*States*, 405 U.S. 150, 152, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), the government's witness's

false testimony was reinforced by the prosecutor's remarks during summation).

Furthermore, as Wilbourn points out in his motion for new trial, the alternative time

frame Cannon proposed is also factually dubious, as Williams indicated he was incarcerated for

the entirety of 2001.  The government argues that "Wilbourn has unfairly pulled an interrupted

_____

[6] Nevertheless, Cannon spent a substantial portion of the government's rebuttal on such topics, arguing, for example:

> Ladies and gentlemen, we make no apologies for the insider witnesses that we called at trial.  They are who they are.  And why do we make no apologies for them?  Because we didn't pick them.  We didn't select them to be our business partners.  They picked them.  They picked the insider witnesses.  And, ladies and gentlemen, what do we know about each of those insiders that we called?  Each of those insiders were corroborated, each of them had other parts of evidence that backed up what they said.
> What else do we know about them?  Each of them backed up one another.  What they told you was consistent.  Senneca Williams.  Senneca Williams was corroborated by hours and hours of evidence from inside the condo, from the trash pull evidence, from the phone call evidence. . . .

Tr. at 2891:3–16.

sentence from the government's rebuttal argument out of context."  Gov.'s Consol. Resp. to

Defs.' Post-Trial Mots. at 55.  First, the government contends that Williams only "testified

during his cross-examination to the years he *believed* he was incarcerated," and "[his] estimates

as to the dates he spent in custody are just that—estimates."  *Id.* at 56 (emphasis supplied).  As

the government recites, Williams testified that he went into custody in "I think April" of 2000

and spent approximately two years in custody.  *Id.*  Second, the government argues that before

being interrupted, Cannon was making the point "that if Wilbourn was incarcerated at a time in

2002 or 2003, then the incidents Senecca Williams described as having occurred during that time

frame must have occurred at an earlier point—2001, 2000, etc."  *Id.* at 55.

These after-the-fact justifications for Cannon's statements during rebuttal, however,

serve only to underscore what the court finds so troubling about the prosecutor's conduct:  the

government's dogged insistence that Senecca Williams's testimony "must have" been truthful,

*see id.*—at least, to the extent it supported defendants' guilt—regardless of the fundamental

factual contradictions inherent within it.  The government repeatedly suggests that any

inconsistencies in Williams's testimony were the result of his being mistaken rather than perjury.

But even if Williams believed he was telling the truth,[7] that would not give prosecutors a license

to ignore the inescapable unreliability of his testimony about Wilbourn's activities in 2002 and

2003 at the Granville apartment.

---

[7] The court notes a number of factors weighing against this conclusion, including the
extraordinary imprecision of, and countless inconsistencies within, Williams's testimony (of
which the false statements discussed above are just a few examples), the reduced sentence he
anticipated in exchange for it, and his admitted perjury in a prior narcotics case involving
Rondell Freeman.

For good reason, the basic principles of evidence require that "[a] proper foundation for a conversation must include information as to *when* and *where* the conversation occurred, who was present, and who said what to whom." *Brown* v. *Chicago Transit Authority Retirement Plan*, 197 Fed. App'x 475, 482 (7th Cir. 2006) (emphasis added). Likewise, "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. At some point, as in this case, it simply becomes unreasonable and unfair for a prosecutor to credit a witness's testimony about events which could not possibly have occurred in the place, time frame, or context in which the witness specifically recounts those events as having occurred.

In sum, even if Williams's testimony about Wilbourn's activities at the Granville apartment was admissible at the time it was initially offered, the shaky foundation on which it was based quickly vaporized under cross examination. Under *Napue*, the government had a duty to correct testimony that it knew to be false. 360 U.S. 264. Whether or not the government can be charged with having such knowledge at the time of Williams's cross examination, it certainly knew so by the time it stipulated to the dates of Wilbourn's incarceration. The court therefore finds that Cannon's statements during the government's rebuttal argument, during which she attempted not only to use but also to bolster Williams's false testimony, constituted prosecutorial misconduct.

The court does not take accusations of prosecutorial misconduct lightly. The court recognizes the substantial challenges prosecutors may face in securing the testimony of cooperating co-defendants and that such testimony often may properly be relied on by the

government even where some doubt is cast on the witness's overall credibility. But as the

Supreme Court has made clear, a prosecutor carries both unique powers and weighty obligations:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935), *overruled on*

*other grounds*, *Stirone* v. *United States*, 361 U.S. 212, 215, 80 S. Ct. 270, 4 L. Ed. 2d 252

(1960). In this case, the government fell short of those obligations. Despite ample notice from

defense counsel and repeated warnings from the court not to improperly rely on Williams's false

testimony, Cannon chose instead to expressly credit it. And by doing so in the government's

rebuttal, she assured that defendants would have no opportunity to respond.

In considering the prejudicial impact of prosecutorial misconduct, the court must

determine "whether there is a reasonable probability that, had it not been for the improprieties,

the defendants would have been acquitted." *United States* v. *Boyd*, 55 F.3d 239, 245 (7th Cir.

1995); *see also United States* v. *Kaufmann*, 783 F.2d 708, 709 (7th Cir. 1986) ("[T]his standard

'may as easily be stated as a materiality standard under which the fact that testimony is perjured

is considered material unless failure to disclose it would be harmless beyond a reasonable

doubt.'") (quoting *United States* v. *Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 3382, 87 L. Ed. 2d

481 (1985)). There is no doubt that Williams's false testimony was material to Wilbourn's

conviction on Count One, the conspiracy charge. Indeed, the government virtually conceded as

much in its response to Wilbourn's motion to dismiss, where its arguments on the issue of prejudice were limited to a brief footnote: "Even if this Court were to find that Senecca Williams committed perjury, his allegedly problematic testimony would only be relevant to Count One in the case, the conspiracy count."  Gov.'s Resp. to Wilbourn's Mot. to Dismiss at 2 n.1.

The government is incorrect, however, in its assumption that only Williams's "problematic testimony" is at issue.  As the Seventh Circuit has reiterated, "[t]he principle that the prosecutor may not knowingly use false testimony applies even when the false testimony goes only to the credibility of the witness."  *Kaufmann*, 783 F.2d at 709–10 (7th Cir. 1986) (citing, *inter alia*, *Giglio*, 405 U.S. at 154; *Napue*, 360 U.S. at 269).  The government's improper bolstering of those portions of Williams's testimony that are verifiably false likewise served to reinforce his overall credibility as a witness.  Defendants were thus unfairly prejudiced with respect to any charges on which there was a reasonable probability that the jury would have acquitted had it discounted Williams's overall credibility.  *See Ross* v. *Heyne*, 638 F.2d 979, 986 (7th Cir. 1980) ("[I]t is immaterial whether the false testimony directly concerns an essential element of the prosecution's proof or whether it bears on the credibility of the witness.").

Wilbourn argues that, in addition to the conspiracy charge, the government's misconduct also denied him due process as to Counts Ten, Eleven, and Thirteen.  Those counts allege that Wilbourn knowingly and intentionally possessed 50 grams or more of crack cocaine on or about March 29, 2006 (Count Ten) and April 1, 2006 (Count Eleven), and 5 grams or more of crack and heroin on or about April 11, 2006 (Count Thirteen).  The government argues that the incidents underlying all of these charges took place "on dates Wilbourn was clearly out of

custody, clearly in the Sheridan Road Condominium unit, and clearly being intercepted in recorded conversations." Gov.'s Resp. to Wilbourn's Mot. to Dismiss at 2 n.1. As to Count Ten, Wilbourn concedes all three of the government's points, but argues that the drug quantity—50 grams or more of crack cocaine—was established by using Williams, who was present in the condominium on that date, to interpret and explain the sounds and conversations recorded by the government. The court agrees with Wilbourn that such testimony was central to the government's contention that the audio surveillance revealed Wilbourn "cook[ing] 125 grams of powder [cocaine] into 180 grams of crack." Tr. at 2691:20–21.

Williams's testimony is likewise important to the drug quantity on which Wilbourn was convicted in Count Eleven. As the government argued in its closing,

> The next count is for April 1st, 2006. That's another count for possession of 50 or more grams of cocaine with intent to distribute and this one involves Rondell Freeman and Brian Wilbourn. Remember the conversation that day, Rondell Freeman talks about how Brian Wilbourn messed up the plate and everything. *Remember what Senecca Williams told you about a plate? A plate is a way they would measure. A plate is one eighth of a kilo, 125 grams.*

Tr. at 2726:13–2726:20 (emphasis added). The government further argued that Freeman and Wilbourn

> continue[d] to talk about what's going on, about the cooking. At one point, Brian Wilbourn talks about the process. And when you look back at that video, you can see that the process he's describing, the process of making things wet, making things dry, bam, all of that stuff, that's crack cocaine. You know at this point after all these weeks how crack cocaine is made and you know that that's what's going on here on April 1st, 2006. Brian Wilbourn knows, too, and so does Rondell Freeman. In fact, as Brian Wilbourn says, remember, you showed me how to do it, right? Again, they've been together a long time. He has learned how to cook crack cocaine from Rondell Freeman, both of them are doing it, far in excess of 50 grams on April 1st, 2006, and both of them are guilty of that count.

Tr. at 2726:13–2727:9 (emphasis added). Here again, Williams provided an evidentiary basis for these assertions, having interpreted—however imprecisely—the government's surveillance recordings of that incident:

Q. Whose voices are those?

A. Rondell Freeman and Brian Wilbourn and myself.

* * *

Q. Mr. Williams, what are they discussing in this segment?

A. In that segment, they discussing about turning powder cocaine into crack cocaine. Rondell Freeman is trying to show Stay High[8] Freeman [*sic*] a better way of doing it from his experience of doing it.

Q. Who is Rondell Freeman trying to show?

A. Brian Wilbourn.

* * *

Q. What are they talking about, Mr. Williams?

A. I can't be exact; but from my experience of born and raised in the projects, pop that shit off was basically a term pop off drugs, sell them on the street but—

Q. I'm sorry, Mr. Williams. Please complete your answer.

A. Well, I can't determine the whole—the full understanding of that point right there.

Q. When you heard the term pop that shit off, was it in the context of drug sales?

A. Yes. If it was indicated by me or anybody that I was associated with, it was terms of selling drugs; yes.

Tr. 1404:13–1405:15.

While Wilbourn has shown that Senecca Williams's testimony and credibility were material to proving the conduct charged in Counts Ten and Eleven, the same cannot be said as to Count Thirteen. Wilbourn concedes that Williams did not testify directly about the conduct charged in Count Thirteen, but argues that "Williams's testimony linking Wilbourn to the orange stripe bags was important to connect[ing] Wilbourn to the crack cocaine recovered on April 11."

---

[8] "Stay High" is a nickname for Brian Wilbourn.

Wilbourn's Mot. to Dismiss at 11.  These charges stem from an April 11, 2006 traffic stop at which Wilbourn, after being asked to step out of the vehicle, got out of the vehicle and took off running.  As he was fleeing, law enforcement officers observed him remove a large plastic bag from his waist and throw it over a fence.  A short time later, the discarded bag was recovered and found to contain approximately 48 grams of cocaine base and 23 grams of heroin.  Wilbourn's conviction on this count was also supported by the testimony of Raven Ramclam, who was the driver of the vehicle at the time of the traffic stop and was with Wilbourn during the preceding hours.  There is no basis to conclude that Wilbourn's conviction on this count was significantly affected by the prosecutorial misconduct.

Finally, the court must consider the extent to which the government's misconduct materially prejudiced defendants Freeman, Hill, and Sanders.  As discussed above, Williams's testimony was crucial to the government's case against all four defendants on Count One, the conspiracy charge.  Indeed, Williams's testimony about a single conversation—that between Wilbourn and Rondell Freeman at the Granville apartment regarding a drug debt owed by Adam Sanders—alone constituted some of the most direct evidence that the government offered to prove those three defendants' involvement in the conspiracy.  As it happens, that conversation was also perhaps the most egregiously false recollection to which Williams testified, as he not only placed Wilbourn at the Granville apartment in late 2002 or early 2003, but also specifically described Freeman "mixing powder cocaine to crack cocaine, and having a conversation with Brian Wilbourn at the same time," and even went so far as to describe what Wilbourn was doing at the time: "He was sitting—sitting down."  Tr. at 1467:3–1467:7.  To add one more example, Williams also testified about instances he allegedly witnessed at the Granville apartment in

which Hill picked up drugs that Freeman had packaged for Hill to deliver to the 1230 North Burling building.

As to Count Eleven, Williams's testimony was as important to obtaining Rondell Freeman's conviction on those charges as it was to the conviction of Wilbourn. As to any other counts on which they were convicted, defendants have not demonstrated that Williams's testimony or credibility were material.[9]

## CONCLUSION AND ORDER

For all of these reasons, defendant Wilbourn's motion for new trial [#678] and motion to reconsider denial of his motion to dismiss counts tainted by trial perjury [#712] are granted in part and denied in part. The court hereby grants a new trial to defendants Wilbourn, Freeman, Hill, and Sanders on Count One, the conspiracy charge; to Wilbourn on Count Ten; and to Wilbourn and Freeman on Count Eleven. Defendants' post-trial motions—including Freeman's motion for new trial or in the alternative for a judgment of acquittal [#670], Hill's motion for new trial [#674], Sanders's motion for new trial [#669], Wilbourn's motion for judgment of acquittal [#677], Hill's motion for judgment of acquittal [#673], Sanders's motion for judgment

---

[9] Except for Wilbourn, defendants' arguments concerning the government's use of Senecca Williams's false testimony are largely either (1) aimed at Count One, the conspiracy charge, or (2) broad attacks on the trial as a whole. The court finds no basis to conclude that the entire trial was tainted as a result of the government's misconduct. *Cf. United States* v. *Williams*, 81 F.3d 1434, 1441 (7th Cir. 1996) ("Because the defendants do not argue that had it not been for the government's misconduct they would have been acquitted of particular counts, as opposed to being acquitted of all the charges against them, we have proceeded on the assumption that their arguments apply to all aspects of the case equally. It was not an abuse of discretion to repel this broad attack.").

of acquittal [#667], and Sanders's motion for judgment of acquittal as to the cocaine conspiracy charged in Count One [#668]—are otherwise denied.

A status hearing will be held on September 30, 2009, at 9:30 A.M.


Dated:  August 26, 2009                    Enter: _____

                                                   JOAN HUMPHREY LEFKOW
                                                   United States District Judge